**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROY E. DRESHMAN, JR.,         )
                                   )      Civil Action No. 09-455
                Plaintiff,   )      Judge Nora Barry Fischer
                                   )
      vs.                    )
                                   )
HENRY CLAY VILLA, ALTA CARE     )
CORPORATION, HEALTH PRIME, INC.,  )
a/k/a HP/MARKLEYSBURG, INC.,       )
KATHY NOGROSKI, D.O.N. and        )
ANNETTE BUFFER, ADMINISTRATOR, )
                                   )
                                   )
            Defendants.   )

## MEMORANDUM OPINION

I.     INTRODUCTION

This employment discrimination case involves allegations by a former male nurse that his female coworkers and supervisors at a nursing home sexually harassed him because of his prior occupation as a stripper as well as his related allegations of sex and age discrimination and retaliation. In his Complaint, Plaintiff Roy Dreshman ("Plaintiff" or "Dreshman") alleges that his former employer, Defendant Henry Clay Villa ("HCV"), and its related entities Alta Care Corporation and Health Prime, Inc., discriminated against him based on his age and gender, retaliated against him for engaging in protected activities and subjected him to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Pennsylvania Human Relations Act ("PHRA"), and the Age Discrimination in Employment Act ("ADEA"). (Docket No. 1). He further claims that his supervisors, Defendants Kathy Nogroski and Annette Buffer ("Individual Defendants") aided and abetted the alleged discrimination in violation of the

PHRA. (*Id*.). Presently before the Court is Defendants' Motion for Summary Judgment. (Docket No. 32). Defendants argue that Plaintiff has failed to present sufficient evidence to support his hostile work environment, retaliation and aiding and abetting claims, while Plaintiff contends that his claims are properly supported by the evidence of record. Upon consideration of the parties' submissions and for the following reasons, Defendants' Motion [32] is granted, in part, and denied, in part.

## II. FACTUAL BACKGROUND

The following facts were compiled from the parties' submissions pursuant to Local Rule 56 and the additional facts of record presented by Plaintiff in his opposition brief and addressed by Defendants in their reply brief.[1] Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to Plaintiff, they are as follows.

### A. *Plaintiff's Prior Work History and Educational Background*

Plaintiff was born on October 13, 1953, and was 54 years old at the time of his termination from HCV in 2008. (Docket No. 31 at ¶ 3; Docket No. 38 at ¶ 1). Prior to working at HCV, from

---

[1]

The Court notes that Plaintiff's submissions are in violation of Local Rule 56.C.1.c, which provides that a nonmoving party's responsive concise statement of material facts, in addition to addressing the moving party's proffered facts, shall "[set] forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment." W.D.Pa.LCvR. 56.C.1.c. Unlike a party's failure to respond to the opposing party's statements of fact, which can be deemed admitted pursuant to Local Rule 56.E., there is no provision in the Local Rules detailing a specific penalty for a nonmoving party's failure in this regard. In this case, Defendants have not moved to strike the additional facts, but have addressed them in their Reply brief. (Docket No. 39). Plaintiff has not filed a sur-reply brief although he was given a deadline for same in the Court's initial scheduling order. (*See* Docket No. 28). Thus, as Defendants have not challenged Plaintiff's facts submitted in his opposition brief under the Local Rules but did address them, and the parties were given the opportunity to be fully heard on this issue, the Court will consider these facts, despite the violation.

1985 through 1997, Plaintiff was a dancer and emcee of several male reviews, including one known as "New York Hot Bodies" ("NYHB"). (Docket No. 31 at ¶ 26; Docket No. 38 at ¶ 10). Plaintiff owned, managed, promoted, and performed as a member of NYHB. (*Id.*). The dancers' performances were similar to the Chippendale dancers and, during shows, Plaintiff and the other dancers would wear only "g-strings" and allow female audience members to slip dollar bills into their "g-strings." (Docket No. 31 at ¶ 27; Docket No. 38 at ¶ 10). The dancers permitted women in the audience to take pictures of them while they were performing. (Docket No. 31 at ¶ 28; Docket No. 38 at ¶ 10). Plaintiff was also in charge of advertising and designed posters to promote NYHB that included pictures of him and the other dancers performing. (*Id.*). The business averaged about 56 shows per year. (Docket No. 31 at ¶ 29; Docket No. 38 at ¶ 10). Plaintiff testified that he stopped working at NYHB a few months prior to the start of his employment at HCV, but later admitted that there may have been some overlap between the two jobs and that he may have requested time off from his position at HCV in order to attend some shows. (Docket No. 31 at ¶ 30).[2]

Plaintiff worked in the construction field during this time period as well. (Docket No. 31 at ¶ 7; Docket No. 38 at ¶ 1). At some point, he obtained his nursing degree from Community College. (*Id.*).

B.    *Plaintiff's Employment and Position at HCV*

---

[2]

Plaintiff has set forth a bare denial to this statement of fact, without any citation to the record, in violation of Local Rule 56.C.1.b. (*See* Docket No. 38 at ¶ 10). Having reviewed the portion Plaintiff's deposition cited by Defendants (Docket No. 36-1, *Dreshman Depo* at 73, 355), Defendants' proffered statement of fact is an accurate characterization of Plaintiff's deposition testimony.

HCV is a nursing/personal care home located in Markleysburg, Pennsylvania.[3] (Docket No. 31 at ¶ 1; Docket No. 38 at ¶ 1). HCV is an at-will employer. (Docket No. 32-2 at 9). In 1997, Plaintiff learned of an open position at HCV from one of his construction coworkers and applied. (Docket No. 31 at ¶ 7; Docket No. 38 at ¶ 1). Plaintiff arranged for an interview with Kathy Nogroski, the director of nursing. (Docket No. 31 at ¶ 8; Docket No. 38 at ¶ 1). During this interview, Nogroski gave him a tour of the facility and asked if he could start the next day. (*Id.*). Plaintiff accepted, but finished out the week at his construction job and began work at HCV the following Monday, June 2, 1997. (Docket No. 31 at ¶¶ 4, 6, 8; Docket No. 38 at ¶ 1). His initial title was Registered Nurse-Supervisor ("RN"). (Docket No. 31 at ¶¶ 4, 6; Docket No. 38 at ¶ 1).

As an RN Supervisor, Plaintiff was responsible for supervising the direct care staff, which included Licensed Practical Nurses ("LPNs") and Certified Nursing Assistants ("CNAs"). (Docket No. 31 at ¶ 10; Docket No. 38 at ¶ 1). Direct care employees were members of the bargaining unit employees of the facility, and accordingly, bid on shift assignments on the basis of seniority. (*Id.*). Plaintiff, and all other RNs, were not members of the union and seniority was of no significance with respect to their positions. (*Id.*). RNs were assigned to various shifts based on their availability, preferences, merit, and the needs of the facility. (*Id.*).

HCV employed both full-time and part-time nurses. (Docket No. 31 at ¶ 11; Docket No. 38 at ¶ 1). The only difference between full-time and part-time nurses was that those who were willing to commit to work at least thirty-two hours per week were considered full-time. (*Id.*). Part-time

---

[3]

From July 2, 2007 to January 12, 2010, HCV was managed by the Defendant, Alta Care Corporation. (*Id.* at ¶ 2). Alta Care is a management company located in Alpharetta, Georgia. (*Id.*).

nurses could and often did work over thirty-two hours per week, but were not obligated to do so. (*Id.*). All nurses, regardless of status, were paid the same rate. (*Id.*). Plaintiff typically worked a double shift from 7:00 a.m.-3:00 p.m. and 3:00 p.m.-11:00 p.m., one or two days per week. (Docket No. 31 at ¶ 13; Docket No. 38 at ¶ 3).

Nogroski was the Plaintiff's immediate supervisor throughout his employment at HCV. (Docket No. 31 at ¶ 9; Docket No. 38 at ¶ 1). After Alta took over management of the facility, Nogroski reported to the facility director, Annette Buffer. (*Id.*). Both Nogroski and Buffer are named in Plaintiff's Complaint as individual defendants. (Docket No. 1).

C.     *Pictures/Posters of Plaintiff in the Workplace*

Within a few months of the start of his employment at HCV, in 1997, some of the other employees recognized Plaintiff from attending one of his shows. (Docket No. 31 at ¶ 32; Docket No. 38 at ¶ 12). Plaintiff also told LPN Edna Baker that he used to be a stripper and managed other male strippers. (Docket No. 31 at ¶ 31; Docket No. 38 at ¶ 12). Some months later, the employees who had recognized Plaintiff from attending his shows were rumored to have brought photographs of him into the workplace that were taken at a show. (Docket No. 31 at ¶ 41; Docket No. 38 at ¶ 14). Baker told Plaintiff about the rumored photographs. (*Id.*). However, neither Plaintiff nor any of the other witnesses who testified saw any of the rumored photographs. (Docket No. 31 at ¶ 42; Docket No. 38 at ¶ 14). Plaintiff testified that he had not heard of anyone bringing in pictures of him from his stripping days into the workplace after 1997. (Docket No. 31 at ¶ 44; Docket No. 38 at ¶ 14).

At some point during his employment at HCV, a fellow employee, Diane Lucy, told Plaintiff that she had seen pictures of him and "pestered" him about getting a poster. (Docket No. 31 at ¶ 45; Docket No. 38 at ¶ 14). Plaintiff testified that he was "shocked" and "embarrassed" by her request,

but acquiesced and gave her a promotional poster from one his shows that included his picture. (*Id.*). Lucy hung the picture on the back of her office door and another employee, Mary Fike, testified that she saw this poster. (*Id.*). After learning that Lucy had put the poster in her office, Plaintiff was upset and asked her about it. (Docket No. 31 at ¶ 47; Docket No. 38 at ¶ 14). Lucy responded that no one comes into her office much, so he should not worry about it, but she did not take down the poster. (*Id.*). Baker also requested a poster and Plaintiff again complied. (Docket No. 31 at ¶ 48; Docket No. 38 at ¶ 14). Baker took her poster home and put it in her scrapbook. (*Id.*).

D.    *Comments/Propositions by Coworkers*

It became well known throughout the workplace that Plaintiff was a former stripper, which prompted some comments and propositions to perform from his coworkers, his supervisor, Nogroski, and some residents of the facility. Employees would often inform new hires and residents of Plaintiff's previous occupation. (Docket No. 31 at ¶¶ 34, 37, 40; Docket No. 38 at ¶ 14). Plaintiff found this "a little annoying." (Docket No. 31 at ¶ 40; Docket No. 38 at ¶ 14). One time when he complained to Nogroski about this, she stated that he was "like a celebrity" and there was nothing she could do to stop the gossip. (*Id.*). Shortly after he started at HCV, Nogroski asked Plaintiff if he could perform at a friend's bachelorette party. (Docket No. 31 at ¶ 33; Docket No. 38 at ¶ 12). Plaintiff declined the invitation and told her that he no longer performed. (*Id.*). A few years after this interaction, Nogroski asked Plaintiff if he knew anyone who could perform at a friend's party. (*Id.*). When Plaintiff said no, Nogroski told him to call the doctor's office where the friend worked to tell her that he could not help. (*Id.*).

Coworker Joann Guseman made comments to Plaintiff about giving lap or pole dances in front of their other coworkers. (Docket No. 31 at ¶¶ 38, 39; Docket No. 38 at ¶ 12). She also

informed one of the residents that Plaintiff was a dancer. (Docket No. 31 at ¶¶ 34, 35; Docket No. 38 at ¶ 12). The resident referred to Plaintiff as "one of those hootchie kootchie dancers," and asked him for a lap dance. (Docket No. 31 at ¶ 35; Docket No. 38 at ¶ 12).

In 2001 or 2002, many of the employees were planning a Christmas party in a room where Plaintiff was present. (Docket No. 31 at ¶ 36; Docket No. 38 at ¶ 13). Someone commented that Plaintiff could strip at the party. (*Id.*). Plaintiff refused, stated "that's not going to happen," blushed and left the room. (*Id.*).

Plaintiff testified that he was also harassed by Fike, a subordinate employee, and that she made sexual advances toward him. (Docket No. 31 at ¶ 64; Docket No. 38 at ¶ 14). Fike denies ever making any sexual advances towards Plaintiff or having any sexual interest in him. (*Id.*). He testified that Fike asked him if she could come over to his house sometime. (Docket No. 31 at ¶ 55; Docket No. 38 at ¶ 14). Plaintiff invited her to bring along her husband, Melvin, who worked as a maintenance supervisor at HCV. (Docket No. 31 at ¶¶ 55, 57; Docket No. 38 at ¶ 14). Fike responded by asking, "[w]hy would I want to bring him?" (Docket No. 31 at ¶ 55; Docket No. 38 at ¶ 14). Fike denies that this conversation took place and stated that she only asked Plaintiff if her husband could go to Plaintiff's property to look for objects with his metal detector. (Docket No. 31 at ¶ 56; Docket No. 38 at ¶ 14). On another occasion, Fike asked Plaintiff if he would like to go out for a drink with her and other employees. (Docket No. 31 at ¶ 58; Docket No. 38 at ¶ 14). Plaintiff responded that he did not go out with people with whom he worked. (*Id.*). Fike also made allegedly sexist comments directed toward Plaintiff. He complained that she would address him arrogantly as "Mr. Big Man Supervisor" or variations thereof. (Docket No. 31 at ¶ 59; Docket No. 38 at ¶ 14).

Plaintiff and Fike both complained to management about each other. Fike knew that Plaintiff

had complained to management about her, but had no reason to suppose that these complaints were related to sexual harassment. (Docket No. 31 at ¶ 65; Docket No. 38 at ¶ 14). Fike characterizes her complaints to management about Plaintiff as pertaining to patient care. (*Id.*).

Plaintiff also did not get along with Mary Ellen Kozak, another LPN who was "best friends" with Fike. (Docket No. 31 at ¶ 60; Docket No. 38 at ¶ 14). Like Fike, Kozak complained to management about Plaintiff not helping with patient care. (Docket No. 31 at ¶ 66; Docket No. 38 at ¶ 14). On two different occasions when Plaintiff corrected Kozak, she stated that "men should not be nurses" and walked away. (Docket No. 31 at ¶ 61; Docket No. 38 at ¶ 14). Kozak denies making these statements but Baker has overheard Kozak make comments of the same substance. (Docket No. 31 at ¶ 62; Docket No. 38 at ¶ 14).

When Plaintiff complained to Nogroski about Fike and Kozak being insubordinate to him, Nogroski responded, "[d]on't take their shit, write them up." (Docket No. 31 at ¶ 63; Docket No. 38 at ¶ 14). Nogroski declares that Plaintiff's complaints about Fike and Kozak were never sexual in nature. (Docket No. 32-1 at ¶ 7). Other employees of HCV, Steve Matthis and his mother Barbara Matthis, knew of the distaste of Fike and Kozak for Plaintiff. Steve Matthis perceived that Fike and Kozak did not like Plaintiff "for some odd reason," but never knew that reason. (Docket No. 31 at ¶ 70; Docket No. 38 at ¶ 14). Steve Matthis heard Fike say that she wanted to get Plaintiff fired because she did not like him. (Docket No. 31 at ¶ 68; Docket No. 38 at ¶ 14). Steve Matthis never saw or heard Fike make any sexual comments to Plaintiff.[4] (Docket No. 31 at ¶ 67; Docket No. 38

---

[4]

Despite his admission of this fact, Plaintiff cites Mathis' "affidavit" for the proposition that "Mary Fike and Joanne Gooseman [sic] always made statements regarding Roy being a stripper." (Docket No. 37 at 9). This statement is consistent with Mathis' "affidavit," which was submitted orally by telephone on October 8, 2009. (*See* Docket No. 36-2 at 22-23). However, Mathis later

at ¶ 14).

Barbara Matthis stated that Fike and Kozak wanted to get Plaintiff fired because they felt he was a bad nurse and would not help them with their work. (Docket No. 31 at ¶ 71; Docket No. 38 at ¶ 14). Aside from a comment made by Fike that Plaintiff "needed to get laid" when he appeared at work in a particularly bad mood, Barbara Matthis never observed Fike or Kozak say or do anything to Plaintiff of a sexual nature. (Docket No. 31 at ¶¶ 73-74; Docket No. 38 at ¶ 14).

Cathy Hetrick, an LPN, would also make comments to Plaintiff. She worked at HCV for a few months in late 2007 and early 2008. Hetrick would call Plaintiff "Pretty Boy" or "Sweet Cheeks." (Docket No. 31 at ¶ 79; Docket No. 38 at ¶ 14). At one point, Hetrick said that her daughter would "have a lot of fun" with him. (*Id.*). Hetrick made comments to Plaintiff that he needed a "BJ," that he needed to get "laid," and that he was so grumpy he needed to "go home and get screwed." (Docket No. 31 at ¶ 81; Docket No. 38 at ¶ 14). Fike overheard the comment about a "blow job," but did not mention it to management at the time. (Docket No. 31 at ¶ 84; Docket No. 38 at ¶ 14). On another occasion, in Nogroski's presence, Hetrick stated that the only reason they kept Plaintiff around was "so that the ladies could look at his butt." (Docket No. 31 at ¶ 80; Docket

---

testified at his deposition on December 16, 2009, under oath, that he only heard Guzeman make a comment once and that he never heard Fike make any sexual comments toward Plaintiff but that she disliked him and wanted to get him fired. (Docket No. 39-3). The Court credits the sworn deposition testimony over the earlier compiled "affidavit."

The Court further notes that because the "affidavits" were prepared before the depositions were taken, and, thus, Defendants had an opportunity to test the contents of the affidavits during the depositions, the sham affidavit doctrine is not implicated. Under the sham affidavit doctrine, "a court will disregard an affidavit inconsistent with an affiant's <u>prior</u> deposition testimony when a party moves for summary judgment on the basis of the deposition unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit." *Smith v. Johnson & Johnson*, 593 F.3d 280, 285, n.3 (3d Cir. 2010)(emphasis added).

No. 38 at ¶ 14). Fike also overheard Hetrick make similar comments of this nature. (Docket No. 31 at ¶ 84; Docket No. 38 at ¶ 14). Barbara Matthis heard Hetrick tell Plaintiff that he was "too good looking to be working at a place like this" and that she could show the Plaintiff a "good time." (Docket No. 31 at ¶ 82; Docket No. 38 at ¶ 14).

Many other comments were made behind Plaintiff's back. Frank Lally, another employee at HCV, once overheard one CNA say to another that they could "just see [the Plaintiff] in his underwear dancing on stage."[5] (Docket No. 31 at ¶ 75; Docket No. 38 at ¶ 14). On a separate occasion, Lally heard someone comment that Plaintiff had a "nice butt." (Docket No. 31 at ¶ 76; Docket No. 38 at ¶ 14). Neither Plaintiff nor a member of management were present when Lally heard these comments. (Docket No. 31 at ¶ 77; Docket No. 38 at ¶ 14). Lally also overheard Fike state that Plaintiff should not be working at HCV and that he should have stayed in his former profession. (Docket No. 31 at ¶ 78; Docket No. 38 at ¶ 14).

E.    *Inappropriate Touching*

Plaintiff testified that he also had his buttocks touched three or four times by coworkers during his ten and a half years of employment. (Docket No. 31 at ¶ 49; Docket No. 38 at ¶ 14). Erica Cupp, an employee at HCV, touched his buttocks on three occasions; once in 2001, once in 2004 or

---

[5]

Plaintiff argues in his Brief in Opposition to Summary Judgment that Lally also heard Nogroski state that "men should not be nurses," relying on Lally's "affidavit" dated October 8, 2009. (Docket No. 36-2 at 7-9, ¶ 7). However, this "affidavit" – akin to the other "affidavits" submitted by Plaintiff – was compiled through a phone interview with Lally prior to his deposition. And, later, at his December 15, 2009 deposition, Lally asserted under oath that he never heard a comment from Nogroski that men should not be nurses at Henry Clay Villa. (Docket No. 39-1, Exhibit "A"). Accordingly, as any statement in the purported "affidavit" is not based on Lally's personal knowledge, the later deposition testimony, submitted under oath, is credited. *See* discussion at n.4, *supra*.

2005, and once in 2007 or early 2008. (Docket No. 31 at ¶ 50; Docket No. 38 at ¶ 14). On the last occasion, Cupp also commented to Nogroski that she (Cupp) had pictures of Plaintiff as a dancer and if he did not "walk in a straight line," she would bring them in to work. (*Id.*). In response, Plaintiff blushed and walked out of the nurses' station. (*Id.*). An employee with the last name Rugg touched the Plaintiff's buttocks in 2004. (Docket No. 31 at ¶ 51; Docket No. 38 at ¶ 14). Shortly after the incident, Rugg either quit or was terminated. (*Id.*). In 2000 or 2001, Rachel Rudge, an employee at HCV, "goosed" Plaintiff as he backed near her while she mopped the floor. (Docket No. 31 at ¶ 52; Docket No. 38 at ¶ 14). Plaintiff jumped, turned red, and left the area in response. (*Id.*). Approximately one month after the incident with Rudge, Plaintiff told Nogroski about the interaction. (*Id.*). Plaintiff could not recall any other incidents of touching that occurred during his time of employment at HCV. (Docket No. 31 at ¶ 53; Docket No. 38 at ¶ 14). Baker witnessed one of these events; though she could not recall when it occurred or who was involved. (Docket No. 31 at ¶ 54; Docket No. 38 at ¶ 14). Baker described the incident as involving nothing more than a playful slap by an employee that she observed as she was passing through the nurses' station. (*Id.*).

F.    *Plaintiff's Complaints to Management About the Alleged Harassment*

Plaintiff testified that he complained to Nogroski a total of four times during his ten and one half years of employment: once in 1997, when a few CNAs told their coworkers that they had seen pictures of him dancing; once in 1999-2000, after someone made an embarrassing comment at the nurses' station; once between 2000-2007, concerning comments made by some of the nurses; and once concerning comments made by Hetrick, who worked at HCV from October 2007 to January 25, 2008. (Docket No. 31 at ¶¶ 85, 87; Docket No. 38 at ¶ 14). Plaintiff also complained to Annette Buffer about comments made by Hetrick. (Docket No. 31 at ¶ 87; Docket No. 38 at ¶ 14). When

Nogroski asked Plaintiff about how Hetrick was doing, he said he did not like the ignorant comments he received from her and complained that if he had made these comments to a woman, he would be fired. (Docket No. 31 at ¶ 86; Docket No. 38 at ¶ 14).

G.  *Plaintiff's Request for a Full Time, Daylight Position*

Customarily, Plaintiff worked two days per week, sixteen hours per day, always starting with the daylight shift. (Docket No. 31 at ¶ 94; Docket No. 38 at ¶ 14).  In October 2007, Plaintiff made statements to Nogroski that he wanted full-time work, which he understood meant thirty-two hours per week. (Docket No. 31 at ¶ 89; Docket No. 38 at ¶ 14).  In response, Nogroski approached Plaintiff about working full-time. (Docket No. 31 at ¶ 90; Docket No. 38 at ¶ 14).  Plaintiff accepted the position.[6]  (*Id.*).  However, when the November 2007 schedule was released, Plaintiff was only scheduled for twenty-four hours one week.  (Docket No. 31 at ¶ 91; Docket No. 38 at ¶ 14).  Plaintiff approached Nogroski about the schedule, and she told him to address it with Kim Morrison, an LPN who did the scheduling. (*Id.*).  Plaintiff was ultimately given full-time work for that week.  (*Id.*).  Plaintiff also claims that Gwen Rischel, a younger, female nurse was given preferred daylight shifts ahead of him.  (Docket No. 31 at ¶ 94; Docket No. 38 at 14).  But, Rischel was required to work all three shifts, as needed.[7]  (*Id.*).

---

[6]

Defendants argue that the Court should not consider Plaintiff's witnesses' "affidavits," which state that he was denied full-time employment, because those individuals later testified that they were not a party to any conversations between Plaintiff and management.  (Docket No. 39 at 6-8).  The Court agrees with Defendants' position and credits Plaintiff's admissions in response to Defendants' concise statement of material facts and the later deposition testimony of these individuals.  *See* discussion at n. 4, 5, *supra*.

[7]

However, as discussed in § V.B. *infra*, the time records submitted by Defendants do not conclusively prove that Plaintiff did not reasonably believe that Rischel received favorable shifts and treatment from management.

Plaintiff informed ten to fifteen of his coworkers that he was going to file EEOC charges when he allegedly did not get a full-time, daylight position. (Docket No. 31 at ¶ 95; Docket No. 38 at ¶ 17). The parties dispute whether management was informed of his intention to file EEOC charges. Defendants maintain that Plaintiff testified that management was not so informed. (Docket No. 31 at ¶ 96; Docket No. 38 at ¶ 17). However, they misconstrue Plaintiff's testimony. While he testified that he did not personally inform anyone in management of his intention to file charges, he also asserted that Nogroski was made aware by his coworkers. (Docket No. 36-1, *Dreshman depo* at 152-55, 224-27). Similarly, Fike declared in her affidavit that Nogroski was aware of Plaintiff's potential EEOC charge because Fike told Nogroski that Plaintiff had threatened to file an EEOC charge.[8] (Docket No. 36-2 at 18-20, ¶ 14). Plaintiff further testified that he believed that Nogroski would have informed Buffer, but admitted that he was speculating that this occurred. (Docket No. 36-1, *Dreshman depo* at 152-55. 224-27).

H. *Defendants' Proffered Reasons for Plaintiff's Termination*

On January 9, 2008, Plaintiff attended a mandatory meeting of the nursing staff. (Docket No. 31 at ¶ 14; Docket No. 38 at ¶ 3). At the meeting, management discussed a number of issues with staff members, including telling the nurses not to fax requests for medication changes to the physician's office because of concerns that the requests may not be received and acted upon in a timely manner. (*Id.*). The nurses were instead instructed to call the physician's office for instructions.

---

[8]

Specifically, in her "affidavit," Fike states that "I heard Roy make comments regarding filing EEOC charges for gender discrimination. Kathy was aware of this as I had mentioned it to her myself." (Docket No. 36-2 at 18-20, ¶ 14). The Court notes that Defendants have not challenged this portion of Fike's "affidavit" in their Reply. (*See* Docket No. 6-8). Instead, they assume for purposes of argument, that management knew of Plaintiff's threat to file an EEOC charge. (*Id.* at 6).

(*Id.*). On January 23, 2008, Plaintiff faxed a request to a physician's office. (Docket No. 31 at ¶ 15; Docket No. 38 at ¶ 3). This was a violation of the directive given at the January 9 meeting. (Docket No. 31 at ¶¶ 14-15; Docket No. 38 at ¶ 3).

Plaintiff was suspended and then HCV terminated his employment on February 18, 2008. (Docket No. 31 at ¶ 5; Docket No. 38 at ¶ 1). HCV stated their reasons for termination included Plaintiff's failure to follow management directives regarding faxing of information to physicians offices, being rude and insubordinate to management staff and coworkers, and failing or refusing to complete admission paperwork on new residents. (*Id.*).

I.       *Plaintiff's Post-Termination Complaint*s

On September 24, 2007, Plaintiff received and signed for an employee handbook, which included a description of the corporate compliance hotline. (Docket No. 31 at ¶ 19; Docket No. 38 at ¶ 5). The employee handbook went into effect on January 1, 2007. (*Id.*). After he was terminated, Plaintiff called the hotline and left a message stating that he had been subjected to sexual harassment during his entire ten years of employment. (Docket No. 31 at ¶ 21; Docket No. 38 at ¶ 7). Then, on May 21, 2008, he filed a charge of discrimination with the EEOC. (Docket No. 1-7).

J.       *Corporate Investigation into Plaintiff's EEOC Charge*

After receiving Plaintiff's EEOC charge, Jackie Sorrells, the HR director, and Evelyn Brown, from ACC's corporate office, traveled to HCV to investigate Plaintiff's allegations. (Docket No. 31 at ¶ 24; Docket No. 38 at ¶ 9). Sorrells and Brown interviewed and submitted questionnaires to Plaintiff's former supervisors, coworkers, and subordinates regarding his sexual harassment complaints. (*Id.*). The result of the investigation by Sorrells and Brown concluded that Plaintiff's complaints of sexual harassment were without foundation.

III.     PROCEDURAL HISTORY

Plaintiff commenced this action by filing his Complaint on February 17, 2009.  (Docket No. 1).  He asserted the following claims against Defendants HVC, Alta and Health Prime: (1) sex and age discrimination; (2) that he was subjected to a hostile work environment stemming from harassment based on his sex and age; and, (3) that he engaged in protected activities and was retaliated against for same, in violation of Title VII, the ADEA and the PHRA.  (*Id*.).  In addition, he has sued his supervisors, Kathy Nogroski and Annette Buffer, alleging that they aided and abetted the alleged discrimination in violation of the PHRA.  (*Id*.).  Defendants filed their Answer on May 28, 2009, and, later, an Amended Answer on June 15, 2009.  (Docket Nos. 9, 12).

After receiving an extension of time from the Court, the parties completed fact discovery as to Plaintiff's claims by January 31, 2010.[9]  Defendants filed their Motion for Summary Judgment, Brief in Support, Concise Statement of Material Facts and Appendix (attached to their motion) on March 19, 2010.  (Docket Nos. 31, 32, 33).  The Court granted Plaintiff's motion for an extension of time to submit his responses and he then filed his Response to Defendants' Motion, Brief in Opposition and Counter Concise Statement of Material Facts on April 26, 2010.  (Docket Nos. 36, 37, 38).  Thereafter, Defendants filed their Reply Brief on May 10, 2010.  (Docket No. 39). Defendants' motion is now fully briefed and ripe for disposition.[10]

---

[9]

In the interim, the parties and counsel participated in an Early Neutral Evaluation before the Honorable Cynthia Baldwin, but the case did not resolve.  (Docket No. 24).

[10]

On July 2, 2010, well outside the briefing schedule set by the Court as to the pending summary judgment motion and for the submission of Plaintiff's expert report, Plaintiff filed his affidavit in opposition to Defendants' Motion for Summary Judgment, which is an affidavit signed by Marcy Pearsall, Ph.D., Plaintiff's psychotherapist and an attached report.  (Docket No. 41). Defendants moved to strike this affidavit.  (Docket Nos. 43, 44).  The Court granted, in part, and,

IV.     LEGAL STANDARD

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir.2007). As to materiality, the relevant substantive law identifies which facts are material.

---

denied, in part said motion.  Pertinent here, the Court held that it would not consider Plaintiff's expert report in ruling on the pending motion for summary judgment.  (Docket No. 47).

*Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

## V.     DISCUSSION

Defendants argue that there are no genuine issues of material facts and that they are entitled to summary judgment as to Plaintiff's hostile work environment, retaliation and aiding and abetting claims.[11] (Docket No. 33). Plaintiff maintains that he has presented sufficient evidence to defeat Defendants' motion. (Docket No. 37). The Court will address the parties' arguments, in turn.

### A.     *Hostile Work Environment Claims*

#### i.     Sexual Harassment Claim

Title VII makes it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2. "A plaintiff may further establish that an employer violated Title VII by proving that sexual harassment created a hostile work environment." *Huston v. Proctor & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)(citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir.1999), *which cited Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). Likewise, the PHRA provides that "[i]t shall be an unlawful discriminatory practice ... [f]or any employer because of the ... sex ... of any individual ... to refuse to hire or employ or contract with, or to bar or to discharge from employment such

---

[11]

As Plaintiff points out in his response, Defendants have not explicitly moved for summary judgment as to Plaintiff's individual sex and age discrimination claims resulting from his suspension and later termination.

individual, or to otherwise discriminate against such individual ... with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract." 43 P.S. § 955(a). "The Pennsylvania courts have held that hostile work environment claims are cognizable under the PHRA." *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 419 (W.D.Pa. 2010)(citing *Phila. Hous. Auth. v. Am. Fed'n of State, County & Mun. Employees*, 956 A.2d 477, 484 (Pa.Commw.Ct. 2008); *Raya & Haig Hair Salon v. Pa. Human Relations Comm'n*, 915 A.2d 728, 732-733 (Pa.Commw.Ct. 2007); *Infinity Broad. Corp. v. Pa. Human Relations Comm'n*, 893 A.2d 151, 157-59 (Pa.Commw.Ct. 2006)). Moreover, "[t]he proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Huston*, 568 F.3d at 104 n. 2 (3d Cir. 2009)(quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 n. 3 (3d Cir.2001) (citations omitted)).

"Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." *Weston*, 251 F.3d at 425-26 (citing *Meritor Savs. Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986), *which quoted* 29 C.F.R. § 1604.11(a)(3)). But, "not all workplace conduct that has sexual overtones can be characterized as forbidden harassment." *Id*. at 428. "In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Id*. at 425-26 (citing *Meritor*, 477 U.S. at 67). Thus, to establish a violation of Title VII or the PHRA based on a hostile work environment, a plaintiff must prove that:

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the

discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Huston*, 568 F.3d at 104 (citing *Weston*, 251 F.3d at 426, *which cited Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir.1990)).  Defendants maintain that Plaintiff has failed to adduce sufficient evidence to establish the first, second or fourth elements of his hostile work environment claim.  The Court will now address each of these arguments.

1.      Intentional Discrimination Based on Sex

Defendants first argue that Plaintiff has failed to demonstrate that he was discriminated against because of his sex, or, stated another way, was subject to sexual harassment.  (Docket No. 33).  Plaintiff does not directly address this argument, but bypasses this element, and maintains that he has presented sufficient evidence to establish at least a genuine issue of material fact that he was subject to severe and pervasive discrimination based on his sex - the second element of his claim. (Docket No. 37).

In order to establish the first element, Plaintiff need not "demonstrate direct evidence of [his] harasser's motivation for discrimination against [him]" nor "direct proof that [his] harasser's intent was to create a discriminatory environment." *Abramson v. William Paterson College of New Jersey*, 260 F.2d 265, 278 (3d Cir. 2001).  Further, discrimination is often difficult to discern from a factual record and "intent to discriminate can be inferred" from more subtle actions.  *Id.* (citations omitted).

As discussed in further detail regarding the second element, Plaintiff has presented sufficient evidence to meet the first element.  For one, Plaintiff has presented much more evidence than that cited by Defendants in support of their argument, i.e., the alleged disagreements between Plaintiff and his subordinate employees Mary Fike and Mary Ellen Kozak, their dislike for him and their

many harassing comments not related to Plaintiff's sex or age, which are not violative of Title VII (or the PHRA) and cannot be considered. *See Moore v. City of Philadelphia*, 461 F.3d 33, 342 (3d Cir. 2006)(quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)("Many may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief"). However, the remainder of the record, including many comments about his former employment as a stripper and his physical appearance, and claimed instances of unwanted touching of a sexual nature, among other evidence, is unchallenged. Further, the parties dispute whether Fike told Plaintiff that he needed to "get laid" and whether Kozak made comments that men should not be nurses, alleged statements by these individuals that do relate to Plaintiff's sex. (Docket No. 31 at ¶¶ 59-62, 73-74; Docket No. 38 at ¶ 14). Therefore, viewing the record in the light most favorable to him, Plaintiff has, at a minimum, presented sufficient evidence from which a reasonable jury could infer sex-based discrimination in accord with the first element.

## 2. Severe and Pervasive Discrimination

Defendants next argue that Plaintiff has not established that the harassment he faced was severe or pervasive and, thus, not actionable. (Docket No. 33).

In determining whether a work environment is sufficiently hostile, the Court must consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

In this Court's estimation, Plaintiff has not presented sufficient evidence from which a jury could find that the alleged harassment occurred with enough frequency to deem it severe and

pervasive. He was employed at HCV for approximately ten and one half years. While Plaintiff testified that he was subject to sexual harassment half the time that he worked, when questioned about this estimate at his deposition, he only identified a number of discrete events or incidents of harassing conduct, thus, the Court will not credit Plaintiff's unsubstantiated estimation.[12] *See Stephenson v. City of Philadelphia*, 2006 WL 1804570, at *11 n.2 (E.D.Pa. June 28, 2006)(not crediting the plaintiff's "unsubstantiated allegations that discriminatory treatment occurred 'all the time.'"), *aff'd*, 293 Fed.Appx. 123 (3d Cir. 2008). Those incidents occurred at a frequency that was sporadic, at most, and could not be considered regular or pervasive.

Plaintiff admits that the specific incidents of harassment "are not innumerable" but argues that they occurred "in concert" and with "regularity" akin to the factual scenarios in *Andrews* v. *City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990) and *Harris*, 510 U.S. at 23. (Docket No. 37 at 6, 17). The Court disagrees. The majority of the claimed incidents of harassment happened years before he was terminated in 2008 and the incidents were isolated, in that the time period between each incident was significant. At times, years passed between the occurrence of any alleged incidents and Plaintiff's complaints to management, if any, were few and far between.

Many of his complaints concern incidents that occurred at or near the beginning of his employment, in 1997. Around that time, a number of the other employees recognized him from his prior profession and there was a rumor that some of these employees had brought in pictures of him

---

[12]

Specifically, Plaintiff testified that "probably 50% of the time I was there someone would make some type of comment about me being a previous stripper or you know, nice butt, or how about a lap dance, that happened several times." (Docket No. 36-1, *Dreshman depo* at 141). Of course, stating that these things happened "several times" and "50% of the time I was there" is also internally inconsistent.

performing at one of the shows (although none of the witnesses, including Plaintiff, testified that they ever saw these pictures) (Docket No. 31 at ¶¶ 41, 42, 44; Docket No. 38 at ¶ 14); his supervisor, Kathy Nogroski, allegedly asked him if he could perform at a bachelorette party, which Plaintiff declined (Docket No. 31 at ¶ 33; Docket No. 38 at ¶ 12); and two other employees, Diane Lucy and Edna Baker, asked Plaintiff for pictures of himself dancing, and Plaintiff provided a promotional poster to each of them – Lucy hung her poster at work behind her door and Baker took hers home and placed it in her scrapbook (Docket No. 31 at ¶¶ 45, 47, 48; Docket No. 38 at ¶ 14). A few years later, Nogroski asked Plaintiff whether he knew anyone that could perform at a friend's party, Plaintiff said "no" and then was asked to contact Nogroski's friend to inform her that he could not help her. (Docket No. 31 at ¶ 33; Docket No. 38 at ¶ 12).

Years passed without any incidents or complaints. Then, in either 2001 or 2002, Plaintiff's coworkers made comments that he could be a stripper for them at a Christmas party. (Docket No. 31 at ¶ 36; Docket No. 38 at ¶ 13). Sometime later, another employee, JoAnn Guseman made a comment to Plaintiff about giving lap dances. (Docket No. 31 at ¶¶ 38-39; Docket No. 38 at ¶ 12). She also told a resident that Plaintiff was a stripper and the resident called him a "hootchie kootchie dancer" and propositioned him for a lap dance. (Docket No. 31 at ¶ 35; Docket No. 38 at ¶ 12).

Plaintiff was subject to inappropriate touching by coworkers on five occasions scattered throughout his ten and one half years of employment: Rachael Rudge "goosed" him in 2000 or 2001, while she was mopping the floor and Plaintiff backed up near her (Docket No. 31 at ¶ 52; Docket No. 38 at ¶ 14); Erica Cupp touched his buttocks once in 2001, once in 2004 or 2005 and once in 2007, or early 2008 (Docket No. 31 at ¶ 50; Docket No. 38 at ¶ 14); and, an employee with the last name Rugg, touched him sometime in 2004 (Docket No. 31 at ¶ 50; Docket No. 38 at ¶ 14). Each

alleged encounter was very brief, and involved only a pinch or slight touch of Plaintiff's buttocks. Even though Cupp was the alleged perpetrator in three such incidents; they were isolated as six or seven years separated the first and third incidents. (Docket No. 31 at ¶ 50; Docket No. 38 at ¶ 14).

More recently, in 2007 and early 2008, another employee, Cathy Hetrick, made a number of sexually charged comments toward Plaintifff. She would call him "Pretty Boy" or "Sweet Cheeks" on occasion and made comments to him that "her daughter would have a lot of fun with him," that he was only around "so that the ladies could look at his butt," and that he was too good looking to work at HCV. (Docket No. 31 at ¶¶ 79-82; Docket No. 38 at ¶ 14). When he was in a bad mood, Hetrick told Plaintiff that he needed to get laid and, another time, that he needed a blow job. (Docket No. 31 at ¶¶ 81, 84; Docket No. ¶ 14). However, there is no evidence that Hetrick ever acted beyond these occasional inappropriate comments.

After viewing these facts in the light most favorable to Plaintiff, and considering the totality of the circumstances, including the limited number of isolated incidents that allegedly occurred throughout Plaintiff's ten and one half years employment at HCV, the Court finds that the claimed harassment was not sufficiently severe or pervasive so as to create a hostile working environment. The incidents alleged were largely verbal comments directed toward Plaintiff and, while the content of the statements were sometimes offensive and their utterances certainly were unprofessional, "[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense," *Weston*, 251 F.3d at 428, or "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(quoting *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)), are not sufficiently severe or pervasive to be actionable. As noted, the gaps between the incidents weigh against Plaintiff. He identified a number of incidents

at the beginning of his employ, in 1997, some later incidents in 2000-2002, a few in 2004 or 2005, and others near the end of his employment, in 2007 and 2008.

In addition, while the alleged touching incidents certainly invaded Plaintiff's personal space and were undoubtedly offensive and could be considered humiliating, it cannot be said that four or five such incidents, which occurred over a seven year period, and involved such a minimal touching of his person, constitute actionable severe and pervasive sexual harassment. *See e.g., Jankowski v. Sage Corp.*, Civ. A. No. 08-770, 2010 WL 1253544, at *8 (W.D.Pa. Feb. 23, 2010)(supervisor's twice placing his hands on plaintiff's shoulder and back and rubbing; four instances of brushing up against plaintiff; and some comments, not severe and pervasive); *Saidu-Kamara v. Parkway Corp.*, 155 F.Supp.2d 436, 439-42 (E.D.Pa. 2001)(four incidents of harassment by supervisor over eighteen month period, including comments and unwanted sexual touching of plaintiff's breasts and buttocks not severe and pervasive); *Bonora v. UGI Utilities, Inc.*, 2000 WL 1539077, at *4 (E.D.Pa. Oct. 18, 2000)(ten incidents of unwanted touching by supervisor over two year period not severe or pervasive); *Swanson v. Nw. Human Servs., Inc.*, Civ. A. No. 05-3054, 2006 WL 3354145, at *3 (E.D.Pa. Nov. 30, 2006)(not severe or pervasive harassment when supervisor told male plaintiff he looked good in jeans, grabbed his buttocks on one occasion and asked him out on dates). Even when coupled with the offensive comments, the gaps of time between the incidents causes the Court to view them as isolated rather than pervasive.

Further, the record – particularly Plaintiff's lengthy 400 page deposition, which the Court has reviewed in its entirety – does not support a finding that the occasional teasing and comments, and the few touching incidents were so severe that they actually affected Plaintiff's ability to do his job. (*See generally* Docket No. 36-1, *Dreshman Depo*). Plaintiff's mild reactions to the alleged conduct,

which often only caused him to blush, feel embarrassed or leave the room where the actions occurred, undermine the claimed severity of the incidents. (*See* Docket No. 31 at ¶¶ 36, 40, 45, 52, 54; Docket No. 38 at ¶¶ 13, 14). The Court understands that Plaintiff at some point sought counseling complaining of many issues, both work and non-work related, but Plaintiff consistently testified that he was a great nurse and denied having any performance problems. Thus, the harassment was not so severe that it interfered with his workplace performance.

In this Court's estimation, a reasonable jury could not find that the harassment alleged was so severe and pervasive that Plaintiff was subject to a hostile working environment. Of course, the Court does not condone the alleged conduct, but Title VII is not a general civility code and only severe and pervasive harassment is actionable. *See Oncale*, 523 U.S. at 81. In sum, considering the totality of the circumstances, and viewing the facts in the light most favorable to him, Plaintiff has not met his burden to present sufficient evidence from which a reasonable jury could infer that the alleged harassing conduct was so severe and pervasive as to constitute a hostile work environment.

### 3. Effect of Harassment on Objectively Reasonable Person

Defendants have not challenged the subjective element of Plaintiff's hostile work environment claim[13] but they argue that the evidence is not sufficient to demonstrate that an objectively reasonable person would be detrimentally affected by the alleged conduct. (Docket No. 33). Their argument is largely reliant on their position that the conduct Plaintiff was subjected to was not severe and pervasive. (*Id*.). The Court agrees with this assessment.

---

[13] The Court notes that, although the subjective element was not challenged by Defendants, as discussed *supra*, Plaintiff's mild reactions to the conduct to which he was subject and his claims that he did not suffer performance problems, undermine the subjective element as well.

As the Supreme Court has recognized, "[t]he prohibition of harassment on the basis of sex ... forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81. Further, "'[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.'" *Id*. (citing *Harris*, 510 U.S., at 21, *which cited Meritor*, 477 U.S., at 67). The objectively reasonable requirement is "crucial" and ensures that "ordinary socializing in the workplace," "teasing" and "intersexual flirtation" is not mistaken as discrimination that affects the terms and conditions of one's employment. *Id*. at 81-2. Finally, the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." *Id*.

Viewing the facts in a light most favorable to Plaintiff, and given the Court's finding that the evidence of sexual harassment presented is not sufficiently severe or pervasive so as to violate Title VII (or the PHRA), in this Court's estimation, a reasonable jury could not conclude that the alleged harassment could alter the terms and conditions of the employment of a reasonable person.

### 4. Conclusion as to Sexual Harassment Claim

For the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim based on alleged sexual harassment is granted.

### ii. Age Discrimination Claim

Defendants have also moved for summary judgment as to Plaintiff's hostile work environment claims under the ADEA. (Docket No. 33). Plaintiff has not responded to their motion on this claim. (*See* Docket No. 37). The ADEA provides that it is unlawful to "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of

employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Courts have held that hostile

work environment claims are cognizable under the ADEA and said claims are analyzed in the same

manner as the sexual harassment claims discussed above. *See Hubbell*, 688 F.Supp.2d at 419 (citing

*Slater v. Susquehanna County*, 613 F.Supp.2d 653, 667 (M.D.Pa. 2009); *Beaubrun v. Thomas*

*Jefferson Univ.*, 578 F.Supp.2d 777, 783 n. 8 (E.D.Pa. 2008)).

  Having considered the record evidence and Plaintiff's lack of opposition to Defendants'

motion, summary judgment is appropriate against Plaintiff and in favor of Defendants as to this

claim. *See* FED.R.CIV.P. 56(c)("When a motion for summary judgment is properly made and

supported" and "the opposing party does not [...] respond, summary judgment should, if appropriate,

be entered against that party."); W.D.PA.LCVR 56.C.2. ("[t]he memorandum of law in opposition

to the motion for summary judgment must address applicable law and explain why there are genuine

issues of material fact to be tried and/or why the moving party is not entitled to judgment as a matter

of law"). Plaintiff has not presented evidence sufficient to establish any of the elements of a hostile

work environment claim based on age discrimination and has not met his burden in defending

summary judgment. Moreover, his admissions as to this claim completely undermine his case.

When questioned at his deposition about any instances of age discrimination at HCV, Plaintiff

testified that Defendants hired Gwen Rischel as a full-time daylight shift employee instead of him

in 2007/2008, and that she was 28 years old and much younger than him, but he could not identify

any other instances of age discrimination. (Docket No. 36-1, *Dreshman Depo* at 216-17).

Specifically, he explained that:

> Honestly if - you know, whether it was age-related, I don't know, you
> know, I can't think of any other times, you know, that – I mean, I'd
> hear comments like, oh, you're an old man, when my birthday would

> come around, but I don't think there was anything – you know, Gwen
> was younger than me, whether that had something to do with it or,
> you know, she was a female, I don't know, I just know I complained.

(*Id.*).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim based on age discrimination is granted.

B.     *Retaliation Claims*

The *McDonnell Douglas* burden shifting framework is applied to analyze Plaintiff's retaliation claims under Title VII, the ADEA and the PHRA.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)(applying framework to a retaliation claim).  Plaintiff has the initial burden to present evidence of a prima facie case of retaliation.  *Moore*, 461 F3d. at 341-42.  If Plaintiff establishes a prima facie case, the burden shifts to Defendants "to advance a legitimate, non-retaliatory reason" for their employment decision and, if they do, the burden shifts to Plaintiff to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for retaliation. *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).  Defendants challenge Plaintiff's prima facie case, assert that they have proffered legitimate, non-retaliatory reasons for their employment decision and argue that Plaintiff has not presented sufficient evidence to demonstrate pretext.  (Docket No. 33).

To establish a prima facie case of retaliation under Title VII,[14] the ADEA,[15] and the PHRA,[16]

---

[14]

42 U.S.C. § 2000e-3, titled "Other unlawful employment practices," provides:

> (a) Discrimination for making charges, testifying, assisting, or
> participating in enforcement proceedings. It shall be an unlawful

Plaintiff must prove that: (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and, (3) there was a causal connection between the protected activity and the employer's action. *LeBoon v. Lancaster Jewish Comm. Cent. Ass'n*, 503 F.3d 217, 231-32 (3d

---

employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e to 2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e to 2000e-17].

42 U.S.C. § 2000e-3(a).

[15] 29 U.S.C. § 623(d), which provides:

(d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation. It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).

[16] The PHRA anti-retaliation provision provides that it shall be an "unlawful discriminatory practice" "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden [thereunder], or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing [thereunder]." 43 Pa.C.S. § 955(d).

Cir. 2007)(citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006)); *see also Hubbell*, 688 F.Supp.2d at 435-37 (discussing the relevant Third Circuit and Pennsylvania precedent and holding that ADEA and PHRA retaliation claims are analyzed akin to Title VII retaliation claims).

At the outset, it appears that the parties disagree on the parameters of Plaintiff's retaliation claims, the protected activities that he engaged in and the alleged materially adverse actions taken by HCV against him. Defendants focus on Plaintiff's threat to file EEOC charges in January of 2008 because he was denied full time employment and daylight shifts and then, terminated in February. (Docket No. 33). However, Plaintiff argues that his retaliation claims rest not only on his January threat to file EEOC charges, but also on his opposition to alleged discriminatory practices at HCV including sexual harassment, particularly the comments by Cathy Hetrick around the same time. (Docket No. 37). Plaintiff further contends that his claim arises from not only his termination in February, but also his earlier suspension in January of 2008. (*Id.*). Having reviewed Plaintiff's Complaint, Plaintiff is correct. He has pled that he: threatened to file EEOC charges; complained about alleged harassing conduct toward him; was suspended; and, then terminated. (*See* Docket No. 1 at ¶¶ 16(y)-(g)(g)). Because Defendants have not challenged Plaintiff's retaliation claims based on his complaints of harassing conduct, nor his suspension, Defendants have not met their burden and these claims survive summary judgment.

Turning to Plaintiff's claim arising from his alleged threat to file EEOC charges, Defendants do not contest that threatening to file EEOC charges would constitute protected activity. Certainly, such conduct would be protected. As our Court of Appeals has recognized, "[p]rotected activity for purposes of a prima facie case of retaliation does not mean a formal action against the employer."

*LeBoon*, 503 F.3d at 232 n.9. "'Opposition' to discrimination under the retaliation provision 'can take the form of informal protests of discriminatory employment practices, including making complaints to management.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006). In *Moore*, the Court of Appeals found that the plaintiffs had engaged in protected activity by virtue of their criticisms of their supervisor's alleged discriminatory conduct, which prompted a threat from management of adverse consequences if the plaintiffs filed EEOC charges. *Moore*, 461 F.3d at 343-46. Following this reasoning, Plaintiff's threat to file EEOC charges against HCV regarding alleged harassment would constitute protected activity.

Defendants' primary contention is that the basis for Plaintiff's threat to file EEOC charges was not objectively reasonable. (Docket No. 33). Their argument is factual in nature; that Plaintiff was offered, accepted and was given a full time position in November of 2007 and that the coworker Plaintiff alleges was given a full time daylight position over him, Gwen Rischel, was not actually given that position, but worked multiple shifts during the relevant period. (*Id.*). Thus, they contend that Plaintiff could not have had an objectively reasonable belief that discriminatory employment practices had occurred. (*Id.*). In response, Plaintiff maintains that disputed facts prevent the entry of summary judgment in Defendants favor. (Docket No. 37).

The Court agrees with Plaintiff. His burden at this stage is not to prove "the merits of the underlying discrimination complaint, but [he must] only [present evidence] that a reasonable person in these circumstances would have concluded that the employer was engaging in discriminatory conduct." *LeBoon*, 503 F.3d at 232 n.9. Moreover, "[a] plaintiff's belief may be mistaken, but employer retaliation is prohibited if the allegations of discrimination have an objectively reasonable basis in fact." *Fogleman v. Greater Hazleton Health Alliance*, 122 Fed.Appx. 581, 583 (3d Cir.

31

2004)(citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). In this Court's estimation, consistent with this standard and viewing the facts in a light most favorable to him, Plaintiff has presented sufficient evidence from which a reasonable jury could infer that he had an objectively reasonable basis for his belief that discriminatory conduct occurred.

At his deposition, Plaintiff admitted that he accepted a full time position in November of 2007, however, he also explained that despite his acceptance of his position, HCV did not schedule him for full time work on two occasions and that he needed to contact the scheduling nurse in order to have his schedule re-set. He further testified at length regarding his previous unsuccessful attempts at acquiring a full time daylight position, and stated that he believed that Rischel was given a full time daylight position over him in 2007/2008. After these occurrences, he threatened to file EEOC charges.

Defendants focus on Plaintiff's admission that he accepted full time employment in November of 2007 and deny that Rischel was given a full time daylight position. (Docket No. 32-1 at ¶ 11). They have produced a summary chart of Rischel's work hours compared to Plaintiff's in support of their assertion that she did not receive a full time daylight position. (Docket No. 32-1 at ¶ 11; Exhibit "F"). In this Court's estimation, the chart is not conclusive on this point. It shows that from November 25, 2007 through February 2, 2007, Rischel worked the daylight shift on 27 out of 40 days. (*Id.*). She and Plaintiff rarely worked together, and when they did, there was a small overlap of only 30 minutes or so between their shifts, except on two occasions. (*Id.*). Meanwhile, Plaintiff generally worked his standard double shift, two days a week. (*Id.*). Therefore, Defendants' evidence does not undermine Plaintiff's testimony that he was told that Rischel was given a full time daylight position nor demonstrate that a reasonable person could not have believed that Plaintiff was

discriminated against given the two schedules. Simply put, even if Rischel did not have a full time, daylight position, a reasonable jury could infer from the evidence presented that she received preferential shifts in relation to those assigned to Plaintiff. Accordingly, Defendants' motion for summary judgment on this basis is denied.[17]

Disputed facts also preclude the entry of summary judgment on Defendants' alternative argument that they were not aware of Plaintiff's threat to file EEOC charges. Nogroski declares in her affidavit that "Dreshman never informed me or anyone else in management to my knowledge that he intended to file an EEOC charge over the denial of the full-time daylight shift." (Docket No. 32-1 at ¶ 12). Plaintiff testified that although he did not tell her directly, Nogroski was aware of his threat to file EEOC charges. (Docket No. 36-1 at 152-55, 224-27). He believed that she knew based on her treatment of him after the threat was made. (*Id*.). In addition, coworker Fike stated that she made Nogroski aware of his threat. (Docket No. 36-2, 18-20, ¶ 14). Thus, as disputed facts exist, Defendants have not met their burden to secure summary judgment as to this claim.

Given these rulings, Plaintiff has met his burden of production and the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for their employment action. The burden placed on an employer to articulate a legitimate non-retaliatory reason for its employment action is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a [non-retaliatory] reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. Defendants have met their burden as they have presented evidence that Plaintiff was terminated

---

[17]
Given this ruling, and having discussed Defendants' objections to Plaintiff's use of "affidavits" above, the Court need not further address same. (*See* Docket No. 39).

because he: violated a specific management directive not to fax requests to physician's offices; mistreated subordinate employees; refused to accept and complete admissions paperwork; and, was rude toward a hospital social worker. (Docket No. 31 at ¶ 5; Docket No. 38 at ¶ 1).

In order to overcome Defendants' proffered legitimate non-retaliatory reasons for their action, the burden shifts to Plaintiff to prove by a preponderance of the evidence that such action was a pretext for discrimination. To meet his burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Further, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons, [...] was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id*. (internal citations omitted)(emphasis in original). Plaintiff is not required to cast doubt on each of the proffered reasons in a vacuum, but "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Id*. at 764, n.7. To this end, "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006)(citing *Fuentes*, 32 F.3d at 764, n.7).

In this Court's estimation, Plaintiff has met his burden to present evidence of pretext and disputed factual issues remain which would otherwise preclude summary judgment.

For one, the decisionmaker behind Plaintiff's termination was Nogroski and Plaintiff has presented evidence that she either participated in or witnessed and ignored many of the alleged harassing activities to which he was subject. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir.1992) ("In proving that the employer's motive was more likely than not the product of a discriminatory reason instead of the articulated legitimate reason, sufficiently strong evidence of an employer's past treatment of the plaintiff may suffice."). There are also disputed facts regarding when and how Plaintiff's complaints about sexual harassment were handled by Nogroski, if they were handled at all. In addition, as discussed above, it is disputed whether Nogroski knew about the threat to file EEOC charges and, her denial should be tested at trial given her alleged involvement in the aforementioned harassment. Certainly, these facts, when viewed in the light most favorable to Plaintiff, are reasons to disbelieve Defendants' proffered reasons for termination.

In addition, Defendants argue that Plaintiff has not rebutted two of their legitimate nondiscriminatory reasons because he "offers no evidence that younger or female nurses were rude to staff members, or hospital social workers." (Docket No. 39 at 7-8). However, they seemingly ignore the undisputed facts regarding the treatment (including the sexual comments and inappropriate touching) that Plaintiff occasionally endured from his coworkers while working at HCV. Plaintiff claims his coworkers went unpunished for many of these incidents and while Defendants argue that Hetrick was terminated after her comments toward Plaintiff, and imply that she was terminated for this reason, there is no evidence of record which details the reasons for her termination.[18]

---

[18] In fact, there is no evidence of record that Hetrick was "appropriately" terminated as Defendants suggest. (*See* Docket No. 33 at 23). Defendants rely on the affidavit of Kathy Nogroski

Plaintiff admits that he violated an oral directive from management not to fax orders to physician's offices, but he questions whether the discipline he received for same, a short suspension and termination, was akin to that received by female employees or was handed down in accord with internal company disciplinary policies.

As to the discipline of other employees, Plaintiff relies on a statement by Fike in her "affidavit" that:

> Roy was disciplined for faxing orders to the doctors. However, he did this to make sure she had the orders in writing so there was no miscommunication in the translation of messages. He would then call to verify that the fax was received by the doctor. He was then disciplined by Kathy for faxing the orders; however the female nurses have faxed orders to the doctor instead of calling and are not disciplined.

(Docket No. 36-2 at 19, ¶ 15). Defendants argue that this statement by Fike is insufficient to establish pretext because it does not identify any of the alleged comparators and there is no other evidence of record to support her assertions. (Docket No. 39). "A violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence." *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 322 (3d Cir. 2000)(citing *Delli Santi v. CNA Ins. Companies*, 88 F.3d 192, 203-4 (3d Cir.1996)). Plaintiff's burden is to "demonstrate that similarly situated employees were not treated equally," *Burdine*, 450

---

for the fact that she was terminated, but her affidavit does not mention Hetrick at all, let alone detail when or why she was terminated. (*See* Docket No. 31 at ¶ 88; Docket No. 32-1 at ¶¶ 1-12). However, in his Counter-Statement of Concise Facts in Dispute, Plaintiff admitted that Hetrick was terminated, (*See* Docket No. 38 at ¶ 14), and the Court accepts this admission as true. *See* W.D.Pa.L.Cv.R. 56.E.

The Court further notes that HCV's policies list sexual harassment as a Type 2 Infraction. (Docket No. 36-3 at 6). A Type 2 Infraction is "so serious" that it warrants a final conference with a supervisor even if a written or oral warning has not been issued and may result in suspension/discharge for a first offense. (*Id.*).

U.S. at 258-59, and considering that no evidence beyond Fike's bare assertion has been presented, Plaintiff has failed to meet his burden on this point.

However, Plaintiff also relies on HCV's disciplinary policies and argues that they were not followed when he was suspended and then, fired. He maintains that the type of infractions he was alleged to have committed did not warrant termination.

At the time of the discipline imposed against Plaintiff, HVC had a progressive discipline policy. (Docket No. 36-3). This was a four-step policy, which included: first, oral counseling, second, that a written warning be issued; third, that a final conference be held and a more serious warning be issued; and fourth, that an employee be suspended, or discharged. (*Id*.). As to suspension and/or discharge, the applicable language of the policy provides that:

> D.      Suspension / Discharge:
>
> If you have a very serious (Type 1) infraction, you will be "SUSPENDED" without pay, subject to discharge when the infraction occurs.
>
> Less serious infractions (Type B or C) will also result in suspension subject to discharge where a Final Conference was issued in the last twelve (12) months for the same infraction.
>
> A thorough review of the suspension subject to discharge will be made by your Department Director, Supervisor and the Administrator to determine what action is appropriate.
>
> Disciplinary action will progress based on each individual rule violation, and IS NOT intended to be cumulative among different rule violations or categories.
>
> E.      Discharge:
>
> To insure that all Personnel Policies are administered and interpreted consistently, NO EMPLOYEE shall be considered discharged until final written approval is received from the Administrator. Any

employee who has been Suspended Subject to Discharge shall receive the Administrator's decision within five (5) working days from the date of suspension.

(Docket No. 36-3 at 3-4). Type 1 infractions are very serious rule violations, including, patient neglect or abuse, theft, fraud, and other offenses. (*Id*.).

In this Court's estimation, none of the reasons for Plaintiff's termination qualify as a Type 1 infraction. Moreover, there is no evidence that a "Final Conference" was held within the twelve months preceding discipline in this case, i.e., before January of 2008. The evidence presented demonstrates that the latest date of documented disciplinary action against Plaintiff was on September 6, 2006. (*Id*. at 12). Thus, it does not appear that an immediate suspension was warranted under subsection D of the policy.

Rather, it appears that Plaintiff could have been disciplined under another section of the policy, but there is no evidence of record detailing the part of the policy that was relied on by Defendants. Only, Nogroski offered some explanation of the discipline imposed on Plaintiff in her affidavit, stating that "I regarded these most recent incidents as part of a pattern of behavior that involved general rudeness and lack of attention to his duties on the part of Mr. Dreshman." (Docket No. 32-1 at 6). Moreover, aside from Nogroski's affidavit, Defendants have not presented any written documentation regarding how the actual discipline was imposed against Plaintiff. (*Id*.). Thus, given the policy language and the lack of documentation, a reasonable jury could infer pretext from the circumstances present here.

Accordingly, after viewing the factual record in the light most favorable to Plaintiff and resolving all reasonable inferences in his favor, *see Watson*, 478 F.3d at 147, Defendants' motion for summary judgment as to Plaintiff's retaliation claims is denied.

C.    *Aiding and Abetting Claims Against Nogroski and Buffer*

The Individual Defendants, Nogroski and Buffer, argue that they are entitled to summary judgment as to the claims against them under the PHRA because Plaintiff has not presented any evidence of discrimination.  (Docket No. 33).  Their argument, however, relies on their position that summary judgment should be entered as to all of Plaintiff's discrimination and retaliation claims under the PHRA. (*Id*.). Because Plaintiff's discrimination and retaliation claims remain, his aiding and abetting claims also survive.  Accordingly, the Individual Defendants' motion for summary judgment is denied.

VI.    CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is granted, in part and denied, in part.  An appropriate Order follows.



*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date:   August 11, 2010

cc/ecf:  All counsel of record.